Filed 7/15/14  P. v. Phillips CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B241821 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA097962) |
| v. | |
| DONALD EUGENE PHILLIPS, | |
| Defendant and Appellant. | |

—————————————————

APPEAL from a judgment of the Superior Court of Los Angeles County.  John A. Torribio, Judge.  Modified and affirmed with directions.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and David E. Madeo, Deputy Attorney General, for Plaintiff and Respondent.

—————————————————

Defendant Donald Eugene Phillips appeals from the judgment entered following a jury trial in which he was convicted of two counts of murder, with weapon-use and multiple special circumstance findings.

On April 19, 1987, Easter Sunday, several neighbors of Edna and George Darrow, an elderly retired couple who lived in Huntington Park, asked police and firefighters to check on the Darrows, who had not been seen for several days. The police opened the Darrows' locked house and found them dead. Defendant, who had been the Darrows' gardener, was quickly identified as the prime suspect, but was not arrested or charged until November of 2006, after a different detective reopened the investigation as a "cold case." Defendant's trial did not commence until October of 2011, more than 24 years after the murders.

Defendant contends the trial court erred by denying his motion to dismiss the case due to the lengthy precharging delay. He argues the delay violated due process because it was unjustified and he suffered actual prejudice through the death of witnesses, faded memories, changed memories, and lost evidence. After reviewing the entire record and the merits of each aspect of prejudice defendant claims he suffered, we conclude defendant failed to show any actual prejudice resulted from the delay. Thus, the trial court properly denied his motion.

Defendant contends the trial court abused its discretion and violated due process by admitting a witness's hearsay testimony regarding a statement by defendant's girlfriend as a declaration against penal interest. We disagree. The girlfriend's statement subjected her to criminal liability as an accessory and was sufficiently trustworthy.

Finally, defendant argues, and the Attorney General concedes, the trial court incorrectly limited defendant's presentence conduct credits pursuant to Penal Code section 2933.1, which was enacted after defendant committed the crimes in this case. Accordingly, we correct defendant's presentence credits and direct the trial court to issue an amended abstract of judgment reflecting the correct credits.

## BACKGROUND

### 1. The crime scene

All the doors and windows in the Darrows' house were closed and locked, and there was no evidence of forced entry. George was found in a bedroom and Edna in the living room. George had five stab wounds to the head and neck and several defensive wounds to his hands. Edna had six stab wounds on her back and three on her head, including two that went through her brain and dented the inside of her skull on the side opposite the entry wound. A deputy medical examiner testified this would require a heavy knife with a blade length of at least four and seven-eighths inches (the width of her skull). She had no defensive wounds and a tissue clutched tightly in one hand, suggesting she was unaware of the attack. The Darrows had been dead two to five days before police found them.

All of the kitchen cleaning products were on the kitchen counter, and the cabinet below the sink was empty. The "trap" pipe under the kitchen sink appeared to be new. A criminalist collected the trap pipe as evidence. One of the fingerprints lifted from it matched defendant.

Police found two documents in the house that mentioned defendant. One of these was a receipt for advance payment for cement work.

### 2. The Darrows and their relationship with defendant

The Darrows' adult daughter Edna Eva Hare testified her mother was 72 years old and her father was 78 years old when they were killed. When Hare last visited them from Michigan in August of 1986, there were no cleaning products sitting on the kitchen counter. These items were instead stored in the cabinet beneath the kitchen sink. In their prior house, when Hare was growing up and her father worked nights, her mother kept a "large machete" under her mattress. But Hare had not seen the machete in the "new house" on Live Oak Street, where her parents died.

The Darrows kept cash stashed in various places in the house, and Edna almost always carried a large roll of cash in her pocket. Many of the Darrows' neighbors had

3

seen Edna carry a large amount of cash in the pocket of the housecoat or muumuu she wore every day and pay workers with money from that pocket. Edna also had told people she and George kept a lot of money in their house.

Defendant did lawn maintenance work in Huntington Park and other cities, initially as an employee of Ed Nelson. In 1986 defendant purchased his route, some equipment, and an old truck from Nelson. Defendant's half brother Jimmy Harris helped defendant with the work, as did defendant's wife Christina from 1985 until they separated at the beginning of 1987. They maintained the Darrows' yard at their prior residence, then continued to work for them when the Darrows moved to the house on Live Oak Street. Christina sometimes talked to Edna while defendant and Jimmy did the yard work, and on occasion she cleaned the house or did Edna's hair or nails. Christina testified the Darrows were extremely nice people, who gave or lent defendant small amounts of money when he needed it and generally treated defendant and Christina as if they were the Darrows' own children.

In addition to his work truck, defendant had a gray Toyota 4x4 truck with a raised suspension, roll bar, "fancy wheels," stripes, and more. He was extremely attached to his truck and did not let anyone borrow it or drive it. He kept a knife that had a compass on the end of the handle either between the seats or under the driver's seat. He told Christina he carried the knife for protection because he carried cash. When the work truck was not working, defendant used his 4x4 truck to perform his lawn maintenance work.

Christina testified defendant once told her the Darrows had a lot of money in their house and asked her to imagine what she and defendant could do if they had a lot of money. She became upset and began shaking. Defendant had never said anything like that about any other client.

When defendant and Christina separated in 1987, she discovered he had not paid the rent or utilities for three months. At some later time, closer to 1989, defendant phoned Christina and requested that if she were contacted by the police, she "back [him]

4

up" by saying he was with her at any time they asked about. She refused. The police did not speak to Christina until 2007.

Jimmy Harris testified he once heard Edna tell defendant she kept money in her house because she did not trust banks and she paid cash for everything. Jimmy was present when defendant signed a contract to do some cement work for the Darrows. Edna gave defendant a down payment of several $100 bills that she retrieved from another room of her house. The next day, defendant told Jimmy the Darrows walked to a doughnut shop every morning at 6:00 a.m. and suggested he and Jimmy should look for money in the Darrows' house while they were gone. Defendant also suggested Jimmy could distract Edna while defendant searched for the money. Defendant repeatedly mentioned the idea of stealing the Darrows' money, but Jimmy always refused to participate. In 2006, Jimmy told Detective Davis that defendant seemed "obsessed" with stealing the Darrows' money. The police did not contact Jimmy until 2006.

Kenneth Grizzell, defendant's "brother-in-law" and friend, sometimes worked with defendant doing landscape work in 1986. Grizzell also helped defendant with cement work in the Darrows' backyard around the summer of 1986. Defendant later told Grizzell the Darrows kept a lot of money under a mattress in the house. Grizzell did not reveal this to the police in 1987 because he did not want to get involved. He told Detective Steve Davis about the statement in 2006.

Both Grizzell and Jimmy Harris testified defendant was very tan and looked somewhat Hispanic in 1987.

**3.      Observations by the Darrows' neighbors during the week of the murders**

**a.      The Kriegers**

At least one week before Easter in 1987, Edna told one of her next door neighbors, Adrieanniea Krieger, that her kitchen sink was plugged and she was going to call the person who had put in the concrete and ask him to find someone to fix it. Sometime during the week before Easter, Adrieanniea saw a truck parked across the street from the Darrows' house. She identified photographs of defendant's 4x4 truck as the one she saw.

She had never seen that truck in the neighborhood before. At the preliminary hearing in April of 2008, she testified the truck was parked in the Darrows' driveway.

Jerome Krieger saw a truck backed into the Darrows' driveway when he arrived home at 3:00 p.m. on Wednesday, April 15, 1987. He identified photographs of defendant's 4x4 truck as that truck. Jerome saw three men at the house, including a slender Hispanic man who stood near the truck. Jerome testified the slender man near the truck looked like defendant did at the preliminary hearing.[1]

Late on the night of April 15, 1987, Adrieanniea heard a succession of sounds from the Darrows' property. First, the gate on the Darrows' driveway rattled twice. Then the Darrows' side door opened, then slammed shut. A few seconds later Adrieanniea heard scuffling sounds, like people wrestling inside the house, then a woman's scream. Later someone vomited in the Darrows' bathroom, then water ran in the kitchen for a long time. Thereafter, the Darrows' back door slammed shut. At Adrieanniea's urging, Jerome and a friend who was visiting him went outside to see what was going on. They went to the Darrows' driveway and up to their back door. Everything was quiet and appeared to be normal.

The police interviewed Adrieanniea in 1987 and she described the truck. But no one showed her any photographs of a truck or any suspects until the preliminary hearing in 2008. Jerome also talked to the police in 1987 and described the truck and the men he had seen at the Darrows' house during the week before Easter. At that time, he said the truck was "possibly" a white 4x4 and he had seen it in the Darrows' driveway on April 14, not April 15, 1987.

**b.     The Sanchez family**

Richard and Debra Sanchez were the Darrows' next door neighbors on the other side. Both saw Edna nearly every day. About three months before the murders, Richard began mowing the Darrows' lawn every week because the person who had previously

---

[1] Jerome Krieger's preliminary hearing testimony was admitted at trial.

done it had stopped working for them. On April 15, 1987, Richard and Debra saw Edna in her driveway and also saw a truck parked in front of the Darrows' house for several hours. Debra also saw a man with Edna in the driveway. After that, they never saw Edna alive again. The next day, Thursday, Richard mowed the Darrows' lawn, but Edna did not come out to chat as she usually did. Richard knocked on the Darrows' door on Friday and Saturday before Easter, but no one answered and all he heard from within was the dog barking.

In April of 1987, Richard told the police that he saw only the truck at the Darrows' house, and did not see any people. He described the truck as a light gray, four-wheel drive Toyota with a roll bar and light bar. Richard said the truck he saw was similar to defendant's truck, but defendant's truck had additional equipment that he did not recall seeing on the truck he had seen at the Darrows' house on April 15, 1987.

At trial, Richard testified he was familiar with the "handyman" who had previously mowed the Darrows' lawn and done cement work for them, and with that man's truck, which Richard had seen at the Darrows' house many times. He identified defendant as that handyman and testified he had seen defendant at the Darrows' house on the afternoon of April 15, 1987. He further testified that the photographs of defendant's truck depicted the truck he had seen at the Darrows' house on many occasions, including the afternoon of April 15, 1987.

In 1987, Debra told the police the truck she saw at the Darrows' house on April 15, 1987, was similar to the former gardener's truck, but some of the equipment differed. She also told the police the man she saw with Edna that day was not defendant. Debra worked with a police artist to construct a composite drawing of the man she saw. She described the man as "a male Mexican in his 20s with dark hair and skin, a mustache and black wavy hair covering his neck."

At trial, Debra testified that the truck she saw at the Darrows' house on April 15, 1987, was the truck of the former gardener, and the photographs of defendant's truck depicted that truck. Debra was uncertain whether the man depicted in the composite

7

drawing she assisted in creating in 1987 was the former gardener. She testified there was a second man at the Darrows' house that day, and she was certain that man was not the former gardener. Debra testified she had seen the former gardener at the Darrows' house earlier in the week before Easter with "a young girl."

Richard's brother-in-law, Victor Rojas, frequently visited Richard and Debra and had gotten to know the Darrows. He testified that he saw defendant walk out of the Darrows' house on April 15, 1987, and up to a modified Toyota truck. In both 1987 and at trial, he identified the truck as that depicted in photographs of defendant's truck. The man was thin, tan, and about 5 feet 8 inches tall. In 2006 Victor selected defendant's photograph from a photographic array, and he tentatively identified defendant at trial. The photographic array included a photograph of defendant from the 1990's.

Victor's son John testified he often visited his aunt, Debra Sanchez, after school and he also became friendly with the Darrows.[2] On April 15, 1987 he saw the truck depicted in photographs of defendant's truck parked in front of the Darrows' house. He saw Edna talking to a thin, white male in his twenties whom he recognized as the man who had worked on the Darrows' cement patio. Victor had seen the man at the Darrows' house several times. The truck was still parked at the Darrows' house when John left at around sundown that day. John spontaneously told the court that defendant looked nothing like the man he saw that day.

Jack Salseda, Jr. also spent a lot of time at the home of his aunt, Debra Sanchez, and also became friendly with Edna. He testified he was often in Edna's house and, although most of the house was cluttered, the kitchen was spotless and tidy. He never saw anything sitting on the kitchen countertops.

4.     **Defendant's first interview with police**

Detectives interviewed defendant on April 21, 1987 and photographed both him and his truck. Detective Whisenant described defendant's truck as a "gray Toyota 4-

---

[2] John Rojas's preliminary hearing testimony was admitted at trial.

wheel drive pickup," "raised-up," with "off-road lights, front brush guard, [and] side step bars." Defendant said he had not been at the Darrows' house since August of 1986 when he and Grizzell did the cement work. He denied knowledge of the murders and denied lending his truck to anyone.

## 5.     Defendant's activities before and soon after the murders

Sometime in April 1987, defendant began dating 16-year-old Sharlene Heineman, who lived in San Bernardino with her aunt, Diana Britton. Britton met defendant for the first time when he arrived at her home with Sharlene on April 13, 1987. The next day, defendant, Sharlene, Britton, and Britton's three young sons went to Disneyland together. Britton testified defendant had no money, so she paid for all of the tickets. She retained the date-stamped tickets and gave them to detectives in 1987. The following day, Wednesday, April 15, 1987, defendant asked Britton if he could take Sharlene with him to pick up money from his gardening customers. Britton agreed, but told defendant to bring Sharlene back that night because she had school the next morning. Defendant did not bring Sharlene back until the next afternoon and Britton was upset. On Friday defendant took Britton, her friend, and Sharlene shopping. He spent about $150 to $250 on Britton, and he bought a lot of clothes for Sharlene. He had a "good size wad" of $100 bills, and spent about $400 to $600 total on clothing and hairdressers.

Defendant's stepsister, Faustina Harris, testified that just before Easter Sunday in 1987, defendant took her, Sharlene, and a relative of Sharlene on a shopping spree. The women also had their hair styled. Faustina thought defendant spent $400 to $500, paid in cash. Before April of 1987, defendant had often taken Faustina on outings and paid her way, but he had never before taken her on a shopping spree.

Britton's sister and Sharlene's aunt Patricia DeClue, met defendant at Britton's house sometime in 1987. DeClue learned they recently had visited an amusement park and gone shopping. Sharlene and Britton showed DeClue clothing defendant had purchased for them and defendant showed DeClue things he had gotten for his truck, including an amplifier and speakers. DeClue asked defendant where the money had come

9

from. Defendant was quiet at first and then said that he had "killed two old people" he had known from his lawn service business. DeClue did not know about the murders, did not think it was an honest confession, and just thought defendant was "a little off." She was also under the influence of methamphetamine when defendant made the statement. She did not report defendant's statement to the police after she found out about the murders because she was using marijuana and methamphetamine in that period and did not want any contact with the police. Also, no detectives contacted her until 2006. At that time, she told Detective Davis about defendant's statement.

Sharlene's mother, Wanda Osteen, testified that sometime in 1987 before defendant and Sharlene went to New York, defendant arrived at her house and asked her if she would store a birthday present he had for his father. She agreed, and defendant retrieved a paper bag from a briefcase in his truck. Inside the bag was a knife with a compass on it, in a sheath. Osteen kept the knife until detectives visited her sometime in the 1980's and asked for it.

Detectives first interviewed defendant's father, Ralph Phillips, on April 20, 1987. Ralph told them that defendant was at his house on Thursday, April 16, and Saturday, April 18, but not on Friday, April 17, 1987.

Defendant's brother, David Phillips, testified that Ed Nelson, a family friend and the person for whom defendant had worked, called him about one week after the murders and said detectives were looking for defendant. About six months after the murders, defendant told David he had been in Palm Springs on his honeymoon with Sharlene at the time of the murders. Another time defendant told David he had been at the Embassy Suites at the time of the murders. David was "pretty positive" he did not see defendant the week of April 12 through April 19, 1987. David was certain that defendant had not visited him at his workplace that week or any other time. He also denied lending defendant money or giving defendant money to hold for him. He testified that defendant had lent him his Toyota truck a couple of times and that defendant always paid for everyone when they went out together.

10

Records obtained from the Embassy Suites Hotel in Downey showed that defendant checked into the hotel after midnight on the morning of April 17, 1987 and checked out before 11 a.m. the same day. He paid cash for the room. Detective Whisenant obtained this information from the hotel's records in 1987. The hotel was 5.92 miles from the Darrows' house.

## 6. Search of Ralph Phillips' home

On July 13, 1987, Ralph Phillips consented to a search of his home. Detectives seized a hunting knife (known at trial as EMK-2), a kitchen knife, and two boxes of papers, including papers reflecting defendant's business and a receipt for $980 truck wheels dated April 23, 1987.

## 7. Defendant's trip to New York

Defendant's half-brother William testified defendant unexpectedly arrived at his home in Germantown, New York, on May 19, 1987, driving the truck depicted in photographs of defendant's truck. Defendant and William were not close. They had different mothers, William was 14 or 15 years older than defendant, and they had not lived together since defendant was about 3 years old. William arranged for defendant to stay with a friend. Sharlene arrived on a different date and she also stayed with William's friend.

On June 12, 1987, defendant was involved in an accident in Germantown that destroyed his gray Toyota 4x4 truck. As a result of this accident, defendant was convicted of a misdemeanor and sentenced to a jail term.

While defendant was in jail, Sharlene went to live with the family of a local teen she had befriended, Serena Saltis. Soon after Sharlene moved in, Serena left for Canada. When Saltis returned at the end of summer, she learned defendant was a murder suspect and detectives had come from California to talk to Sharlene. Saltis told Sharlene that Saltis's parents were worried and did not want her to go back with defendant. She asked Sharlene if she had any information about the murders. Sharlene was nervous and hesitant to speak, but eventually told Serena that defendant came home one evening

11

covered in sweat, with blood on his clothing, carrying a long-sleeved shirt stuffed with money. The shirt's sleeves were tied. Defendant had a bloody knife and asked Sharlene to help him. Although she initially refused, she eventually relented and washed the blood off the knife. The same knife had been in defendant's truck at the time of the accident. After the accident, Sharlene went to the impound lot, removed the knife from the truck, and stored it in her suitcase. Saltis testified Sharlene became very upset and was crying as she described what had happened.

Saltis did not tell anyone what Sharlene had said until years later. No law enforcement officers contacted Saltis about the murders until 2006 or 2007. At first, she did not tell them anything, but when she was contacted again by Detective Davis in 2007, Saltis reported her conversation with Sharlene.

William testified Sharlene had contacted him after she went to stay with Saltis's family and asked him to keep defendant's possessions. Sharlene had told William defendant was a suspect in a stabbing murder in Los Angeles. One of the items William received from Sharlene was a "survival knife" in a sheath.

Detective Whisenant traveled to Germantown twice in the summer of 1987, the first time in July with Detective Horton, then again with Detective Lyons in August. There, they interviewed Sharlene, William, and others associated with defendant. During the August trip, William gave the detectives defendant's survival knife and sheath. Whisenant described the knife as an 11.5 inch, "rather ostentatious . . . Rambo-type knife" with a 6-inch blade serrated on one side and a compass on the end of the handle. At trial this knife was commonly referred to as "EMK-4," its crime-lab designation.

## 8. Forensic testing and testimony

Criminalist and "tool mark" expert Steven Dowell testified the Darrows' stab wounds were made by a single-edge knife with a thick dull-edge. Three of the four knives recovered by police in this case had dull edges that were one-eighth inch thick, and two of these three—EMK-4 (the knife recovered in Germantown) and EMK-2 (the survival knife recovered from Ralph Phillips's home) were consistent with causing the

Darrows' wounds. Of these two, EMK-4 was the most consistent because of the way its tip bent. Dowell opined only about ten percent of the knives he had examined during his career would have been capable of inflicting Edna and George's wounds.

Blood was found on only one of the knives recovered by police: EMK-4. The blood was on a washer inside the handle of the knife and there was too little to perform further testing. Testing in 1987 revealed that there was human blood on the sheath that had been recovered with EMK-4. After the case was reopened in 2006, testing revealed the presence of defendant's DNA on the sheath. No blood or DNA was found on the knife detectives obtained from Sharlene's mother (Osteen).

Exclusion testing was performed in 1987 on blood found inside the Darrows' house. Neither Edna nor defendant could be excluded as the source of blood on a carpet sample.

No "foreign DNA" was found in the victims' fingernail scrapings. Two cigarette butts found in the driveway were collected and testing conducted after the case was reopened established the DNA found upon them was not defendant's.

**9.     Defendant's police interview in New York and statement to jailer**

On July 8, 1987, while defendant was in custody in Germantown, he told correctional officer Ralph Graziano that detectives from Los Angeles wanted to interview him about the murder of his ex-employer. He said that he had nothing to worry about because he was at Disneyland at the time of the murder.

Detectives Whisenant and Lyons interviewed defendant in jail in Germantown on August 12, 1987. Defendant told them he took Sharlene and her family to Disneyland on Tuesday, April 14, 1987, and he paid for everyone's admission. On Wednesday, April 15, he and Sharlene visited his brother David at David's workplace to return some money that defendant had held for him. They then drove to Ralph Phillips's house in Pinion Hills in San Bernardino County, where they spent Wednesday and Thursday nights. When they returned to Britton's home on Friday, Britton was angry that Sharlene had been gone so long. On Friday, April 17, defendant and Sharlene went to see a movie and

13

then spent the night at the Embassy Suites hotel on Firestone Boulevard. On Saturday morning, defendant took Sharlene and Britton shopping at a San Bernardino mall. Britton had her hair styled. Defendant and Sharlene spent Saturday night and Easter Sunday at Britton's house. Defendant said that the money he spent came from his accumulated savings, which he hid with his lawn equipment, but he was unable to provide the detectives with a "reasonable account[] for the money he had spent."

Defendant told the detectives that he quit working as a gardener for Nelson on March 24, 1987. The last time he was at the Darrows' house had been in April of 1986 when he put in a cement slab. Defendant said that he had done some plumbing work for the Darrows sometime before the cement work, but he denied doing any such work in the kitchen.

**10.    Ralph Phillips's 2006 interview and 2007 conditional examination testimony**

In an interview with Detective Davis on August 22, 2006, Ralph Phillips said defendant had told him three or four months before the murders that he had done yard work and fixed a garbage disposal for an elderly couple who had a lot of money they kept in boxes and flashed around. Defendant said it would be easy to rob them.

Ralph also told Davis that defendant and Sharlene did not stay at his house around the time the murders occurred, but he was not sure. Ralph said, "The night I remember when supposedly that happened, [defendant] was in, made a couple of collect calls to me, I think he was in Palm Springs." He later added that defendant called late at night and said he was stuck there because someone borrowed his truck. Ralph agreed he thought "it was the night these people were killed."

Ralph told Davis defendant had made about $1000 per week in his lawn care business and would "save some of it up then blow it on this and that and whatever. And he'd save up again and blow some." Ralph did not recall defendant ever having a large amount of money. When the detectives first interviewed Ralph in 1987 defendant had $500 to $600 in a drawer in the room he used in Ralph's house. Ralph also said the knives seized in 1987 were his, not defendant's.

14

By the time of trial, Ralph had died. His testimony at a January 2007 conditional examination was admitted at trial. Ralph testified that sometime around 1984 or 1985 defendant had told him that some "old people" he worked for had "boxes of money and they'd be easy to rob." Ralph did not know whether defendant was talking about the people who were later murdered. After the murders, defendant was "pretty well broke up, and he said that 'I don't know why they had to kill them people. All they had to do was wait until they was going to the bank or something and take their money.'" Ralph further testified "after this happened, [defendant] had no heart for doing lawn business." Defendant "didn't work" and he "put [his business] down the tube."

## 11.     Defendant's 2006 police interview

### a.     August 2006 interview

On August 15, 2006 Detectives Davis and Cheryl Comstock reinterviewed defendant. The interview was recorded and the recording was played at trial.

Defendant initially claimed not to remember the Darrows by name or from a photograph of their house, but soon told the detectives he had done yard work and concrete work for them. The last work he did for them involved spreading concrete in their backyard. He thought it was more than a year before they were murdered. He later recalled he had also repaired the "trap drain" for the kitchen sink sometime prior to the concrete work. When the detectives told defendant all the items that would normally be kept beneath the kitchen sink had been found on top of the counters when the Darrows' bodies were found, he said, "Maybe it could've been after that I did her pipe. I don't remember doing it. I think I did that stuff before the concrete." He denied doing any work for the Darrows in April 1987. He also denied he had ever taken Sharlene to the Darrows' house.

Defendant denied involvement in the Darrows' deaths, knowing who killed them, and saying he had killed anyone. He admitted he had kept a sheathed "survival knife" in his truck, but he denied using it to kill the Darrows.

15

The detectives told defendant that people saw his truck at the Darrows' house around the time of the murders. Defendant insisted he was "not around there." He said that he took Sharlene and her family to Disneyland and that day or the next day his father told him some detectives had called and wanted to talk to him. He did not remember taking anyone shopping, but he recalled staying at an Embassy Suites with Sharlene the same day they went to Disneyland.

**b.     November 2006 interview**

On November 1, 2006, Davis and Comstock reinterviewed defendant. The interview was recorded but the recording was not played at trial. Instead, portions were read into the record. Defendant denied both knowing the Darrows kept money in their house and telling anyone they kept a lot of money in the house and would be easy to rob. He further denied suggesting Jimmy distract Edna while defendant went in the house to take money, but admitted he may have said that jokingly.

Defendant also denied his truck was at the Darrows' home at the time of the murders, telling DeClue he killed people, asking Osteen to hold a knife, and taking Sharlene to any customer's house. Defendant again said he worked on the Darrows' kitchen pipes the year before they were killed and added he had also put a "flex hose" in the bathroom.

Defendant was arrested at the conclusion of the interview.

**12.     Defendant's trial testimony**

Defendant testified he purchased a lawn route from Ed Nelson in September of 1986, after working the same route for Nelson for two years. He serviced the Darrows' yards at their old house, then their new house, but he stopped around the time that he did concrete work in their backyard. The Darrows were nice and treated defendant like their own son. They paid him in cash when he asked for payment. In 1986, about a year before the murders, defendant did concrete work in their backyard. After they signed the contract for the concrete work, Edna went to another room and returned with five $100 bills that she gave defendant as a down payment. About one year before the murders,

16

defendant replaced a pipe somewhere in the Darrows' house. He thought it was in the bathroom. He checked the kitchen sink, but did not remember replacing any pipes there.

Defendant testified when he worked his lawn maintenance route he made about $4,000 per month, not including handyman work he performed on the side. He often carried a lot of cash with him, and he kept a knife in his truck for protection. He kept a lot of cash hidden in a shed at his father's house.

In January 1987, defendant left his wife Christina. Around the end of March, 1987, his business declined because he "didn't care anymore." He only worked for the customers who paid in cash, not checks. His income declined to about $2,000 to $2,500 per month. A few weeks before the murders in April 1987, he started seeing Sharlene and began using drugs with Sharlene's aunt Patricia.

When defendant learned that detectives wanted to talk to him about a murder, he went to the police station to speak with them. He did not know who had been murdered at the time. His knife was in the truck, which the detectives searched, but they did not find the knife. Defendant no longer remembered where he went, other than Disneyland, during the week before Easter in 1987, but he testified he was honest with the detectives about his whereabouts during the week of the murders. Defendant testified that he paid for everyone when he, Sharlene, Britton, and Britton's children went to Disneyland.

Defendant testified he, his sister, and Sharlene went to Palm Springs and stayed overnight on a weekend around that time. He thought it was the Saturday before Easter Sunday. He had previously had receipts from that trip, but he had given them to the detectives. He admitted he had told the detectives, however, that he spent Saturday night drinking with Britton at her house.

Defendant testified he wanted to impress Sharlene, and he took her, Britton, and Faustina shopping. He agreed he had probably spent $400 to $500 for everything he purchased for everyone. On April 23, 1987, defendant spent about $1,000 on equipment for his truck. The money he was spending was money he had saved at an earlier time.

17

In May 1987, defendant went to New York to see his family. He had told his aunt at an earlier time he would probably visit her, then after being interviewed by the detectives, he reached his breaking point and decided to go. When he decided to stay more than a week or two, he paid for Sharlene to fly out to stay with him.

Defendant testified when he talked to the Germantown jailer, he did not know who had been killed and thought it was Ed Nelson or Joseph Gadow. He only found out the victims were his customers when Los Angeles detectives interviewed him in Germantown, but he still did not know which customers. On cross-examination, defendant admitted he had learned that the victims were the Darrows when he was interviewed in April of 1987. He claimed he was mistaken when he told Davis in 2006 he did not know which of his customers had been murdered, and he thought when detectives interviewed him in Germantown they were talking about someone else.

The detectives who interviewed defendant in Germantown told him to come see them when he returned to Los Angeles, so when he returned in 1987 he promptly went to talked to them and "took a blood test at L.A. County." He admitted that nothing in the discovery obtained from the prosecution reflected that interview.

Defendant denied killing either of the Darrows or being at their house "the week of April 19, 1987" or any time in 1987. He further denied he ever "said anything to Sharlene about any bloody shirt or money." He denied confessing to Patricia DeClue and suggested she made up the statement to prevent him from telling the police she possessed a stolen car. He also denied telling anyone, including his father, that the Darrows kept a large amount of cash in the house or that it would be easy to steal money from them. Defendant admitted his truck was very unique, and he never lent it to anyone other than his brother David.

## 13. Verdict and sentencing

The jury convicted defendant of two counts of first degree murder and found true several special circumstance allegations: multiple murder, murder in the commission of robbery or attempted robbery, and murder in the commission of burglary or attempted

18

burglary.  The jury further found defendant personally used a deadly or dangerous weapon in the commission of the murders.

The court sentenced defendant to life in prison without possibility of parole, plus two years for the weapon-use enhancements.

## DISCUSSION

**1.    Denial of defendant's motion to dismiss for precharging delay**

**a.    Motion and ruling**

**(1)    Defendant's motion**

More than two years before trial, defendant moved to dismiss the charges on the ground the lengthy delay of nearly 20 years in filing the felony complaint against him was unjustified and prejudicial, and thus violated his right to due process.  The motion cited as prejudice the death of Sharlene, Detective Horton (one of the original investigators), and the deputy medical examiner who performed the autopsies on the Darrows; the failure of recollection of Detectives Whisenant and Lyons (the other two original investigators) and Ed Nelson; "missing" bank records for defendant; degraded and missing bloodstains and samples; failure to photograph the open cabinet under the kitchen sink the day the Darrows' bodies were found; failure to photograph the pipes under the kitchen sink before removing the one on which defendant's fingerprint was found; the absence of reports regarding whether other, unidentified fingerprints were "run through AFIS for a match"; the absence of "mention whether any of the doors leading outside the home were ever processed for prints"; loss or degradation of bone and tissue samples from the Darrows that were saved for, but not analyzed by, Dowell; and loss of "third party culpability evidence" pertaining to "19 burglaries in the immediate vicinity of the Darrows' residence between January 1987 and April 1987" "with suspect descriptions similar to this case," sightings of strangers and homeless people in the neighborhood, and a murder of a man with a hunting knife "by an adult and two juveniles, all Hispanic," about one mile from the Darrows' house on August 1, 1987, for which the Huntington Park Police Department's files were unavailable due to a computer crash.

19

The motion also noted Sharlene told investigators she had seen a knife covered in blood shortly after the murders and defendant asked her to bury it, and she told an aunt in Texas years after the murders she had sat in car outside a house while defendant went in, when he returned he was "'white as a sheet'" and said he had stabbed and killed a couple of people.

**(2)    The prosecutor's opposition**

The prosecutor opposed the motion and explained that, although defendant was the prime suspect in 1987, "after informal discussions with the Los Angeles County District Attorney's Office it was determined that there was insufficient evidence for filing."  The prosecutor argued the delay was not intentional, was justified, and defendant did not suffer actual and substantial prejudice.  The opposition set forth in chronological order a summary of the investigation as it stood in 1987,  as well as the "new evidence" developed from June of 2006 through the preliminary hearing in April of 2008.

In 1987, according to the opposition, the police knew defendant had worked for the Darrows as gardener and handyman and defendant knew the Darrows kept a lot of money in the house; the cabinet beneath the kitchen sink was empty and its probable contents were sitting on the counter; defendant's fingerprint was found on the sole "bright shiny spot" of the drain pipe assembly beneath the kitchen sink; defendant's unique truck was seen at the Darrows' house on April 14 or 15, 1987; the man who had worked on the Darrows' patio in 1986 was seen at their house on the afternoon of April 15, 1987; defendant had worked on cement for the Darrows' patio in 1986; noises were heard at the Darrows' house on the night of April 15, 1987 and they were not seen alive again after that; defendant did not have much money when he went to Disneyland with Sharlene's family on April 14, 1987, but he had "a wad of cash" when he returned from Los Angeles to Britton's house on the night of April 15, 1987 and thereafter took Sharlene, Diana, and others on shopping sprees; defendant and Sharlene "suddenly relocated to upstate New York" within days after he was interviewed by detectives in this case; when a jail officer in New York told defendant detectives wanted to ask him about a Los Angeles murder,

defendant said he had nothing to worry about because he had been at Disneyland at the time of the crime; when interviewed in New York defendant said he had worked on plumbing in the Darrows' bathroom, but did not mention the kitchen; defendant gave "a detailed timeline of his activities the week of the murder which was substantially impeached by other witnesses and physical evidence"; defendant, Sharlene, Britton, and Ralph Phillips "gave inconsistent statements of Defendant's whereabouts and activities during the week of the murders"; Ralph Phillips told detectives that just before he went to New York, defendant said, "'I've got to get out of town before something happens to you and mom'"; Sandra Underwood told detectives Sharlene showed her and other local teenagers an "assault knife" and said defendant had used it to stab a Black man; and Sharlene's stepsister told detectives defendant "had related the same information to her."

New evidence cited in the opposition included a re-interview of Adrieanniea Krieger in August of 2006 in which she "related for the first time that" Edna had said "she intended to contact the person who had laid her cement patio and ask them to arrange for a plumber" to fix her clogged kitchen sink. Also, defendant had said for the first time in his August 2006 interview he had fixed a pipe in the Darrows' kitchen.

Investigators had also interviewed or re-interviewed several people who said defendant had spoken of the Darrows keeping cash in the house and being easy to rob. David Phillips was re-interviewed and said Jimmy Harris had told him that around the time of the murders defendant "had always been trying to work up a scam to steal from the victims" and had a plan to do so involving Jimmy. David's wife Brenda Phillips told investigators Jimmy Harris also told her of defendant's plans to steal the Darrows' money. Jimmy Harris was interviewed for the first time and told investigators Edna told him she kept all of her money in her house, defendant repeatedly urged Jimmy to help him rob the Darrows, defendant was obsessed with the Darrows' money and talked about it all the time to many people. Kenneth Grizzell was re-interviewed and said that around the time of the murders defendant had told him and others that the Darrows kept lots of money in their house. Ralph Phillips was re-interviewed and said defendant often had

21

spoken about how much money the Darrows had and how easy it would be to rob them. And in defendant's November, 2006 interview, he conceded he might have jokingly "asked his brother Jimmy to keep the Darrow[]s busy while he looked for their money."

Ralph Phillips also had made statements inconsistent with his prior statements and told investigators for the first time that defendant had fixed the Darrows' plugged garbage disposal and had been in Palm Springs when the Darrows were murdered. Patricia DeClue had been interviewed for the first time, and she told investigators that when she asked defendant the source of his wealth defendant replied that he had killed two old people for whom he had performed gardening work. Sharlene's brother, David Heineman, had been interviewed for the first time, and he said he helped defendant with his lawn work in 1987. Defendant once persuaded another of his assistants to steal a woman's purse while they were working. Jack Salseda, Sr. was interviewed for the first time in 2006 and stated he visited the Sanchez house on April 15 or 16, 1987 and saw a unique truck in the Darrows' driveway. He identified the truck as that depicted in photographs of defendant's truck. He also saw a man at the Darrows' house that day that he had previously seen loading lawn equipment into a truck. Jack Salseda, Jr. was also interviewed for the first time in 2006 and told investigators Edna always carried cash in the pocket of her blue muumuu and the Darrows' kitchen was always tidy, with no supplies left on top of counters.

In addition, DNA testing revealed the presence of defendant's blood on the sheath of the knife recovered from William Phillips in New York, Steven Dowell analyzed the victims' wounds and the recovered knives and concluded "all but the wood handled knife that had been recovered from Ralph Phillips in 1987 were consistent with having inflicted the injuries to the victims."

The prosecutor's opposition also cited several matters developed after defendant was arrested and charged. These included Serena Saltis's 2007 interview in which she revealed Sharlene's statement to her about defendant returning home with a shirt stuffed with money and a bloody knife.

22

The prosecutor expressed willingness "to stipulate to the admission of . . . all of Sharleen's statements that would have been admissible had she been present to testify."

**(3)  Defendant's reply**

Defendant filed a reply and, a year later, a "Supplemental Motion to Dismiss," but neither document contested the prosecutor's factual assertions regarding the course the investigation followed.

**(4)  The trial court's ruling**

The trial court delayed ruling upon the motion until after the close of evidence at trial.  During the trial, Davis testified that between 1987 and 2006, neither the Sheriff's Department nor the Huntington Park Police Department "was looking for [defendant] for these charges."

When the trial court considered the motion after the close of evidence, it noted defendant's "whereabouts had been well known or easily ascertainable throughout the entire period" from 1987 through 2006, and "there has been no offer of an explanation of the delay.  The only new evidence developed in the ensuing 20 years was the statement from the young lady [Serena Saltis] regarding the confession that the court allowed in. [¶]  Other than that, all the fingerprints, the car, all of the circumstantial evidence, the spending of money, on and on and on, was fully aware to the People."  The prosecutor noted defendant's "confession" to DeClue and his two 2006 statements were also new matter.  The court agreed.

The court then stated, "The court, based on 40 years of experience in this field, finds that there was ample evidence to bring [defendant] to trial in 1987; that the circumstantial evidence based upon everything that was available, was more than enough to—for a prosecutor to expect a very good chance of a conviction.  So the court find[s] there's no real justification for the delay."  The court later stated it found no intentional delay, and thought the case "just fell through the cracks from everything I can see."

The court stated, however, defendant "was fully aware that he was the prime suspect in a murder of two individuals that were not strangers to him but in fact known to

23

him; that his whereabouts that week was critical; and the court does not find that there's any of the presumption of prejudice due to the delay that exists in the other cases. Specifically, as stated in *Doggett* [*v. United States* (1992) 505 U.S. 647 [112 S.Ct. 2686]] at some point the delay becomes so long that efforts to show specific prejudice become meaningless because you don't even know what the prejudice may be. [¶] So the court does not find that factor to be present and the court believes that is the critical factor in determining whether or not there's been a denial of due process. So the court's preliminary discussion, before hearing from you, is to deny it on the basis that the defendant . . . was fully aware and was in a good position as anyone to try to figure out what happened and where he was and what was going on in his life during that period of time."

Defendant then cited, as additional aspects of prejudice, the inability to compare the Darrows' wounds to the knife mentioned by Edna Eva Hare; lost third party culpability evidence pertaining to "potential plumbers, Anthony Rosales and . . . Lance Inman," and Hare's deceased husband; the changed memories of Richard and Debra Sanchez and John and Victor Rojas allowing them to "make better identifications" of defendant's truck at trial; the loss of records pertaining to defendant's business; the death of Wanda Osteen's husband; the deterioration of health and memory of Jerome Krieger, Ralph Phillips, and Detective Whisenant; loss of opportunity to find unspecified "impeachment witnesses that may or may not have been available back in '87"; and loss of unspecified character witnesses for defendant.

The prosecutor asked whether the court "has made a filing [sic] that the defendant did not suffer actual prejudice." The court replied, "That's correct." After brief argument by the prosecutor, the court denied the motion without further comment.

Defendant contends the court erred by denying his motion.

**b.**       **Law regarding precharging delay and standard of review**

Although statutes of limitations are the primary safeguard against precharging delay, "due process provides additional protection, safeguarding a criminal defendant's

24

interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence." (*People v. Abel* (2012) 53 Cal.4th 891, 908 (*Abel*).)

Prejudice from precharging delay is not presumed. (*Abel*, *supra*, 53 Cal.4th at pp. 908–909.) The defendant "must first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time." (*Id.* at p. 908.) "If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay. [Citation.] But if the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified." (*Id.* at p. 909.)

Under California law, either negligent or deliberate delay designed to disadvantage the defendant may violate due process. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1255 (*Nelson*).) Because deliberate delay is completely unjustified, "a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Id.* at p. 1256.) "The justification for the delay is strong when there is 'investigative delay, nothing else.'" (*People v. Cowan* (2010) 50 Cal.4th 401, 431 (*Cowan*).)

In balancing the justification against the prejudice, the trial court "should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges." (*Nelson*, *supra*, 43 Cal.4th at p. 1256.) "'Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt . . . . Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused because investigative delay is not so one-sided. A prosecutor abides by elementary standards of fair play and decency by refusing to seek

25

indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt.'" (*Ibid.*) The trial court must also resist "second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case." (*Ibid.*) "It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Id.* at p. 1257.)

We review for the trial court's ruling for abuse of discretion and defer to the trial court's underlying factual findings if substantial evidence supports them. (*Cowan*, *supra*, 50 Cal.4th at p. 431.)

**c.      Defendant failed to demonstrate actual prejudice from the precharging delay**

**(1)      Deceased witnesses**

Defendant argued at trial and argues on appeal the precharging delay prevented him from calling several witnesses who had died by the time of his trial or, in some cases, by the time he was charged. However, he has not shown any likelihood that any of these witnesses would have provided testimony beneficial to his defense.

Sharlene, who was with defendant for much, if not all, of the week of the murders, was interviewed by the police in 1987 and defendant did not seek to introduce those statements at trial, even though the prosecutor offered to stipulate to admission of her statements. She also made several statements to various individuals that strongly tended to implicate defendant in the Darrows' murder, although the only one of these introduced at trial was the statement to Serena Saltis. Had she testified at defendant's trial, she may have provided him with an alibi, but she might instead have provided the prosecution with highly incriminating testimony implicating him in the Darrows' murder. Given her status (as discussed in the context of defendant's second issue) as an accessory after the fact, she may have invoked her privilege against self-incrimination and refused to testify. If she had done so, the prosecutor almost certainly would have offered her immunity to testify against defendant. Even if we were to assume she voluntarily testified and

26

provided testimony favorable to defendant, the credibility of that testimony would have been diminished by her numerous inconsistent statements and the bias inherent in her relationship with defendant. Defendant therefore has not demonstrated, and indeed cannot demonstrate, actual prejudice from the loss of Sharlene's testimony.

Defendant has not explained what he believes Detective Horton, the deputy medical examiner who performed the autopsies of the Darrows, or Wanda Osteen's husband would have helped him prove and how that would have benefitted his defense. The relevance of testimony by Osteen's husband is not explained at all. A different deputy medical examiner was able to testify about the Darrows' autopsies by reference to the documentation and photographs created during the course of the autopsies. Defendant has not identified any issue the testifying deputy was unable to address or resolve. Horton was just one of three original investigators, and the other two testified. In defendant's motion in the trial court, he argued the prejudice from being unable to examine Horton pertained to "the fourth knife" that was "identical to two of the knives taken from [defendant] and his father" and the Sheriff's Department's refusal to enter the DNA from the cigarette butts in a database to look for a match because the prosecutor said they were not part of the crime scene. The evidence developed at trial established the fourth knife was the one defendant gave to Wanda Osteen. Thus, there was nothing beneficial to be had from Horton regarding that knife. The issue regarding the DNA on the cigarette butts was not one caused by Horton's unavailability as a witness. Had Horton still be alive and employed by the Sheriff's Department, he might also have refused to check the DNA against the database. Defendant could have asked the trial court to order the prosecutor to request that the DNA profile be checked against the database. In any event, identification of such men would not necessarily exonerate defendant because some of the neighbors testified they saw multiple men at the Darrows' house on the afternoon of April 15, 1987. Jerome Krieger testified he saw three men and Debra Sanchez testified and told police she saw two men.

27

Thus, defendant has not demonstrated actual prejudice resulting from the death of any of these potential witnesses.

**(2)    Faded memories**

Defendant argued at trial and argues on appeal he was prejudiced by the diminished memories of various witnesses resulting from the precharging delay. Some of these witnesses had died by the time of trial, but testified at conditional examinations.

Detective Whisenant testified at a conditional examination, portions of which were admitted at trial. His memory of the crime scene was limited, but he had reviewed his notes and reports, the other two detectives' reports, and the "murder book." Defendant had all of that documentation and he has not explained how he believes Whisenant's testimony at an earlier time would have benefitted him. Similarly, defendant has not set forth any theory of how he would have benefitted from Lyons' testimony at a trial closer in time to 1987.

Ralph Phillips was interviewed by the police in 1987 and again in 2006, and he testified at a conditional examination in January of 2007, during which he testified he was honest when he talked to detectives in April 1987. Some of Ralph's early statements to the police were somewhat beneficial to defendant, others were incriminating, and some conflicted with defendant's and Sharlene's statements about the week of the murders. Notably, he did not provide defendant with an alibi for April 15, 1987, the day neighbors and relatives of neighbors saw defendant's truck at the Darrows' house and heard noises and a scream from the house. Although Ralph's 2006-2007 statements and testimony were less favorable and more incriminating, defendant has not shown and cannot show that testimony Ralph might have given at a trial nearer 1987 would have benefitted defendant, rather than contradicting defendant's own claims or even incriminating defendant.

Jerome Krieger testified at the preliminary hearing, during which he identified the truck he saw April 15, 1987 as the one depicted in photographs of defendant's truck and testified he saw a man near the truck who looked like defendant. Krieger was

28

interviewed by the police in 1987 and defendant had a copy of the report of that interview. Defendant has not explained why he believes Krieger's testimony at a trial nearer 1987 would have been less incriminating or more beneficial.

Defendant also argues "the decline of Ed Nelson, his former employer . . . due to Alzheimer's disease, foreclosed any opportunity to demonstrate what [defendant] was doing professionally at the time of the murders." This claim is related to defendant's argument that his business and banking records were lost and pertains to the defense contention that the money he spent during the week preceding Easter was revenue from his business, not money he stole from the Darrows' home. However, because defendant had *purchased* his lawn route from Nelson and Nelson was no longer defendant's employer, it is doubtful Nelson would have had personal knowledge of defendant's earnings. Even assuming, for the sake of argument, Nelson had possessed such knowledge and testified at a trial nearer 1987 that defendant was making a certain amount of money, this would not establish how much, if any, of his earnings defendant had available to spend in mid-April, 1987. In this regard, we note Christina testified when she and defendant separated in January of 1987 she discovered defendant had not paid the rent or utility bills for three months, Ralph Phillips told the police in 1987 that after defendant and Christina separated defendant "worked less and less and virtually had no source of income," and defendant testified his income declined by about half near the end of March, 1987 because he "didn't care anymore" and only worked for customers who paid in cash.

Accordingly, defendant has not demonstrated actual prejudice resulting from the faded memories of any of these witnesses.

**(3)    Improved memories**

Defendant contends he was prejudiced by the ability of Richard and Debra Sanchez and John and Victor Rojas to "make better identifications" of defendant's truck at trial. We note, however, Victor Rojas identified the truck he saw at the Darrows' house on April 15, 1987 as the one in photographs depicting defendant's truck soon after

29

the murders in 1987. In addition, as far as the record reveals, the descriptions of the truck given by each neighbor who saw it were not only consistent with defendant's truck but also consistent with the other neighbors' descriptions. Defendant's truck was heavily modified and unusual, if not unique. Defendant had copies of police reports of these witnesses' statements from 1987 and was able to use these reports to cross-examine the witnesses about their greater certainty at trial. Witnesses at trial often testify differently than their statements to the police; the remedies for this phenomenon are cross-examination, introduction of the witness's prior inconsistent statement, and, where identifications are concerned, introduction of testimony by an expert regarding eyewitness identification. Defendant has not shown and cannot show that the any of these witnesses' testimony at a trial nearer 1987 would have been less incriminating.

**(4)     "Lost evidence"**

Defendant also argued at trial and argues on appeal he was prejudiced by the precharging delay because certain evidence was lost between 1987 and 2006.

Defendant argues his "missing" business and bank records impaired his ability to show he had money he had earned from his business to spend during the week preceding Easter. However, defendant testified he kept his business records in his father's shed, detectives seized papers pertaining to defendant's business when they searched Ralph Phillips' house in the summer of 1987, and defendant testified that to the best of his knowledge all of his business records were provided to the detectives in 1987. Defendant has never claimed that the police lost or destroyed these papers or the papers themselves became unreadable. To the extent the police did not seize all of defendant's papers, defendant was on notice in 1987 that he was a suspect in the Darrows' murder and that police were inquiring about his sources of income. Accordingly, he had an incentive immediately after the murders to preserve his business and bank records. (See *Cowan*, *supra*, 50 Cal.4th at p. 432.) In addition, defendant testified his savings were in the form of cash and were hidden with his lawn equipment and in his father's house. Bank records would not reflect these cash stashes. Furthermore, as previously noted, other evidence,

30

including defendant's own testimony, tended to show he had experienced financial difficulty in early 1987 and a showing of what he had earned did not mean he had that money available to spend during the week before Easter.

Defendant argues he was prejudiced by precharging delay because he no longer had access to the Toyota 4x4 truck. However, the truck had been wrecked in Germantown during the summer of 1987. Thus, the precharging delay was not responsible for the loss of the truck. In addition, detectives photographed the truck when they interviewed defendant on April 21, 1987. Defendant does not claim the truck's appearance had changed between April 15 and April 21, 1987.

Defendant argues the delay left him unable "to show the witnesses what [defendant] looked like back in 1987 at the time of the crimes." However, detectives also photographed defendant when they interviewed defendant on April 21, 1987. Defendant does not claim his appearance had changed between April 15 and April 21, 1987.

Defendant argues the delay resulted in loss of the opportunity to find unspecified impeachment evidence and unspecified character witnesses. This claim is inherently speculative. Impeachment evidence may or may not have existed in 1987, and, if it existed, it may still have existed at the time of trial. Indeed, the delay arguably provided a greater opportunity for witnesses to make contradictory statements and commit acts of moral turpitude, if they were so inclined. As for character witnesses for defendant, defendant has not shown that he had no friends, associates, or family members alive and available to provide favorable testimony at the time of trial.

Defendant further argues the precharging delay "foreclosed" "third party culpability avenues." In his original motion, he argued several such "avenues" he no longer asserts on appeal. He now refers only to "plumbers Anthony Rosales and Lance Inman," and Hare's deceased husband. Hare testified she and her husband lived in Michigan and flew to California when notified by the police that her parents had been found dead. Before that, they had not visited California since August of 1986. Nothing in the appellate record indicates defendant had any reason to suspect Hare's husband was

31

in California, not Michigan, at the time of the murders. The appellate record does not reflect any information regarding Rosales or Inman or their connection to the Darrows, let alone any reason to suspect they murdered the Darrows. The other third party culpability theories addressed in defendant's motion to dismiss are even more speculative. In order to be admissible as third party culpability evidence, there must be direct or circumstantial evidence linking the third person to the actual perpetration of the charged crime, not just evidence that a third person merely had a motive or opportunity to commit the crime. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1017.) Defendant has not set forth any reason to believe Hare's husband, Rosales, or Inman could be linked to the Darrows' murders. He therefore has not and cannot demonstrate any actual prejudice from the inability to investigate third party culpability.

Defendant also argues he was prejudiced because the bloodstains and samples were degraded or missing. Defendant has not explained how he believes further testing using the testing methods available nearer 1987 would have benefitted him. His written motion stated, "Although some of these samples were analyzed in 1987, the science available at the time was capable only of limited results. Since this time, DNA has been discovered and testing is available . . . ." Had the blood samples not degraded, both the prosecution and defense could have performed much more sophisticated testing upon them. But defendant cannot legitimately claim the inability to perform such testing was caused by the precharging delay, as opposed to the state of forensic science at the time of the crimes. Had defendant been charged in 1987 and tried within a reasonable time thereafter, he would have been limited to "the science available at the time."

Defendant similarly argues he was prejudiced by the loss or degradation of bone and tissue samples from the Darrows that were saved for, but not analyzed by, Dowell. Defendant's written motion noted the deputy medical examiner who performed the autopsies "collected bone samples from George Darrow in four jars." The motion further noted, "From Edna Darrow, Steve Dowell himself took 'sections of both temporal bones including the knife penetrated areas, a large block of thoracic vertebrae and attached

32

posterior rib regions, including the knife-wounded areas there and a large piece of knife wounded skin from the back' for his analysis. . . . Although these samples were taken in April 1987 and the 'suspect knife' was submitted in July 1987, no analysis was done until November 2006. [¶] Upon visiting Steve Dowell at the Corner's Forensic Lab, we discovered that his November 2006 report was done using only the autopsy photos, two bone fragments, one from each victim, and the autopsy reports. It appears that the other samples had been lost or destroyed in the intervening 19 years. He stated that if the samples do still exist, they would have been in formalin for a long time and might not be helpful."

Defendant has not shown that Dowell's analysis was inaccurate or inadequate. He could have asked Dowell at trial whether examination of additional bones and the one tissue sample collected would have been more accurate or revealing, but he did not. In addition, because it is completely speculative to assume that Dowell's opinion would have been different if he had used tissue and bone instead of photographs for his analysis and comparison, the existence of any actual prejudice to defendant is also completely speculative.

Finally, defendant argues he was prejudiced because "the knife which was known by Edna Hare to have been stored by her mother beneath her bedroom mattress was lost or unaccounted for." However, the precharging delay did not cause the "loss" of this knife. The police did not find it and Hare testified she had never seen the knife in the house in which the Darrows died. She testified her mother kept that knife under her mattress when they lived in a different house and George worked nights. When they were murdered, George was retired and they lived in a different house.

Accordingly, defendant has not demonstrated actual prejudice resulting from the "loss" of any of this evidence.

**(5)    Nonexistent evidence**

Defendant also argues he was prejudiced because the police failed to photograph the open cabinet under the kitchen sink the day the Darrows' bodies were found, failed to

33

photograph the pipes under the kitchen sink before removing the one on which defendant's fingerprint was found,[3] did not write a report regarding whether other, unidentified fingerprints were "run through AFIS for a match," and did not "mention whether any of the doors leading outside the home were ever processed for prints." An arguably imperfect investigation, not precharging delay, caused the nonexistence of these matters. Had defendant been charged in 1987, there still would have been no such photographs and, if the doors had not been processed for fingerprints, it would likely have been fruitless to process them after the police had ended their control over the house. After he was charged in 2006, defendant could have requested the prosecutor to ask the police to check unidentified fingerprints against databases. In any event, as stated in *Cowan*, *supra*, 50 Cal.4th at p. 434, "[E]ven if some other suspect's fingerprints were on the items, defendant still would have been linked to the murders because his own fingerprints were found at the crime scene."

### d.    The delay was, at worst, negligent.

As noted, the trial court concluded the delay was not justified. But its conclusion this case "just fell through the cracks" constitutes an implicit finding the delay was not an attempt to gain a tactical advantage over defendant. Nothing in the record suggests the delay was a tactic. Thus, at worst, the delay was negligent, and a greater showing of prejudice was required. (*Nelson*, *supra*, 43 Cal.4th at p. 1256.)

### e.    The trial court properly denied the motion.

Had defendant been charged in 1987 and tried within a reasonable time thereafter, the evidence presented by both parties undoubtedly would have been different than that at the trial in 2011. However, defendant failed to establish that he suffered actual prejudice from the lengthy delay. The original investigation was sufficiently thorough and

---

[3] During Whisenant's conditional examination, the prosecutor introduced at least one photograph described as showing the cabinet under the kitchen sink, but for the purpose of addressing the issues on appeal, we accept defendant's assertion regarding the failure to photograph as true.

34

memorialized in reports, notwithstanding the omissions cited by defendant. Defendant was interviewed just two days after the bodies were found and thereby placed on notice at that time he was a suspect in the murders and needed to account for where he had been and what he had done in the relevant time frame. To the extent some lines of inquiry or questioning were unavailable to defendant after 19 years, he has not shown that his defense would have obtained any benefit from being able to pursue such matters. After reviewing the entire trial record, we do not find that defendant's ability to defend against the prosecution's case was so impaired that he was denied a fair trial.

Accordingly, we conclude the trial court did not abuse its discretion by denying defendant's motion and defendant's due process rights were not violated by the lengthy delay.

## 2. Admission of Sharlene's statement to Serena Saltis

Before the preliminary hearing, the prosecutor sought to admit Saltis's testimony regarding the statement Sharlene made to her in 1987 about defendant coming home with a bloody knife and a shirt stuffed with cash. Specifically, the prosecutor told the court, Saltis would testify Sharlene told her defendant arrived home late one night, sweaty, frantic, and nervous. He had blood on his clothes and was carrying a long-sleeved shirt tied at the wrists and packed full of money. He told Sharlene she had to help him. She was scared, but personally washed blood off a knife. She later took the knife to New York in her suitcase. The prosecutor argued the statement constituted a declaration against interest, in that it subjected Sharlene to criminal liability as an accessory.

Defendant opposed admission of this testimony, arguing Sharlene's statement did not qualify as a declaration against interest and its admission would violate the Confrontation Clause. The trial court ruled Sharlene's statement qualified as a declaration against interest and did not implicate the Confrontation Clause because it was not testimonial.

Saltis testified at the preliminary hearing she spoke privately to Sharlene, saying Saltis's parents had told her detectives had come to interview them about a double

35

homicide they believed defendant had been involved in.  Sharlene repeatedly said she could not say anything, then became more upset and nervous and began crying.  Saltis conveyed her parents' concern for Sharlene's safety.  Sharlene mentioned a knife and "said that [defendant] had come home one evening to their apartment that they share together and he was covered with sweat and very upset and wanted her help.  That when he came in he had a long sleeve shirt with the sleeves tied and . . . the shirt was stuffed full of money and that she personally washed the blood off of the knife in the bathroom sink."  Sharlene also said defendant had blood on his clothing, she was "very scared," and defendant asked her to wash the blood off the knife, saying, "'You know, you are going to have to help me here.'"  Sharlene further said defendant had told her at the time another man was involved and an elderly couple were stabbed many, many times and robbed.  Sharlene told Saltis she had brought the knife with her in her suitcase.  Sharlene said the knife had been in defendant's truck when it was impounded, and she had later retrieved it from the truck and kept it with her personal property.

Defendant renewed his objection at trial and added due process as a ground for exclusion.  The trial court again admitted Saltis's testimony regarding Sharlene's statement.  Saltis was not asked about, and did not testify to, defendant's statement that another man was involved and an elderly couple were stabbed and robbed.

Defendant contends Sharlene's statement did not qualify as a declaration against interest because she lacked the knowledge and intent required to be an accessory and her statement was untrustworthy because she said defendant came home to an apartment they were sharing, whereas Sharlene was living with Britton at the time of the murders. Defendant further argues the improper admission of Sharlene's statement was so inflammatory as to violate due process.  He does not contend it resulted in any violation of the Confrontation Clause.

a.      **Law regarding declarations against penal interest and standard of review**

"Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness

36

and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

The proponent of the evidence must also show that the declaration was sufficiently reliable to warrant admission. (*People v. Geier* (2007) 41 Cal.4th 555, 584 (*Geier*), overruled on another point by *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [129 S.Ct. 2527].) "'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'" (*Ibid.*) The "most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335 (*Greenberger*).) Conversely, "the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others." (*Ibid.*) "[A]ssessing trustworthiness '"requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception."'" (*People v. Duarte* (2000) 24 Cal.4th 603, 614 (*Duarte*).)

We review the trial court's decision regarding the admissibility of such a statement for abuse of discretion. (*Geier*, *supra*, 41 Cal.4th at p. 585.)

**b.      Law regarding accessory status**

Penal Code section 32 defines an "accessory" to a crime as follows: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such

felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

The accessory must know that the principal committed a felony or has been charged with the commission of one. (*People v. Wilson* (1993) 17 Cal.App.4th 271, 275 (*Wilson*).)

## c.      Sharlene's statement was properly admitted as a declaration against her penal interest.

Defendant argues Sharlene's conduct, as described in her statement to Saltis, did not make her an accessory (and thus was not against her penal interest) because she was 16 years old, "did not want to help" defendant, had no "knowledge of what had taken place before she saw [defendant] with the bloody knife," "neither understood what she was doing, nor had any specific intention to aid and abet [defendant's] evasion of arrest," and acted from "fear and emotion" by "relenting in what he was ordering her to do under the worst of circumstances."

## (1)      Sharlene's statement demonstrated the knowledge, intent, and conduct required to make her an accessory.

The circumstances described by Sharlene demonstrated she knew at the time she acted that defendant had committed multiple felonies: defendant arrived home sweaty and with blood on him, carrying a bloody knife and a shirt stuffed with cash, and told Sharlene an elderly couple were robbed and stabbed many, many times. This was more than sufficient to inform anyone, even a 16-year-old, defendant had committed felonies. Although Saltis's trial testimony did not include the statement by defendant about robbing and stabbing an elderly couple, the trial judge had conducted the preliminary hearing and was aware of the full content of Sharlene's statement when he ruled. We review the trial court's ruling "at the time it was made, . . . not by reference to evidence produced at a later date." (*People v. Welch* (1999) 20 Cal.4th 701, 739.)

Notwithstanding Sharlene's initial reluctance to help defendant, she relented and not only washed the blood off the knife, but thereafter made repeated efforts to conceal

38

that knife. She told Saltis she carried it to New York in her suitcase, retrieved it from defendant's truck after it was impounded in New York, and again hid it in her suitcase before giving it to defendant's brother. Nothing indicated she performed these acts under duress. Her conduct thus reflects her intent that defendant avoid arrest, trial, conviction, and punishment.

Finally, Sharlene's admission she destroyed evidence by washing the blood off the knife and concealed evidence by transporting the knife from California to New York, then retrieving it from defendant's impounded truck and hiding it in her suitcase established the conduct required to make her an accessory. "Concealment of a weapon used by the principal in the commission of a felony may constitute the actus reus of the offense." (*Wilson*, *supra*, 17 Cal.App.4th at p. 275.)

Accordingly, Sharlene's admissions to Saltis subjected her to criminal liability as an accessory to the robbery and murder of the Darrows.

**(2)     Sharlene's statement was sufficiently trustworthy.**

Sharlene made her statement to Saltis in the type of setting deemed most reliable: a "conversation . . . between friends in a noncoercive setting." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335.) In addition, the surrounding circumstances support the trial court's conclusion Sharlene's statement was trustworthy. Saltis testified Sharlene initially said she could not say anything, then, as she told Saltis what happened, she became highly emotional. Nothing in the record suggests Sharlene was attempting to divert criminal responsibility from herself to defendant, which is the most common context in which a statement is deemed too untrustworthy to constitute a declaration against penal interest. (See *Duarte*, *supra*, 24 Cal.4th at pp. 611–612.)

Defendant argues Sharlene's statement was untrustworthy because Saltis testified Sharlene referred to defendant returning to an apartment they shared, whereas other evidence in the record indicates they were not living in an apartment. However, the nature of the location to which defendant returned was merely a collateral detail and may have merely been Saltis's interpretation, years later, of different words used by Sharlene.

39

We cannot conclude this single collateral detail rendered the statement so untrustworthy as to preclude its admission in light of the surrounding circumstances reflecting trustworthiness.

Accordingly, we conclude the trial court did not abuse its discretion by admitting Saltis's testimony regarding Sharlene's statement. Nor did its admission violate due process. Application of the rules of evidence ordinarily does not violate due process. (*People v. Cunningham* (2001) 25 Cal.4th 926, 998.) The admission of evidence may violate due process if there is no permissible inference a jury may draw from the evidence. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) The jury could permissibly infer from Saltis's testimony regarding Sharlene's statement that defendant had committed a violent, blood crime using the knife he asked her to wash, and had obtained the money in the shirt in the commission of that crime. It could further infer that the knife known as EMK-4 that detectives collected in New York was the same knife used by defendant in the crime, then washed, transported to New York, and concealed by Sharlene. Accordingly, admission of Saltis's testimony did not violate due process.

### 3. The trial court erroneously limited defendant's presentence credits.

Defendant contends, and the Attorney General concedes, the trial court incorrectly limited defendant's presentence conduct credits pursuant to Penal Code section 2933.1, which was enacted more than seven years after defendant committed the crimes in this case. The parties agree defendant should have been awarded 1,004 days of presentence conduct credits, for a total 3,012 days of presentence credits. Accordingly, we correct the award of credits and direct the trial court to issue an amended abstract of judgment reflecting the correct credits, if it has not already done so.

## DISPOSITION

Defendant's presentence credits are corrected to be 3,012 days total, consisting of 2008 days of actual custody and 1004 days conduct credits.  The judgment is otherwise affirmed.  The trial court is directed to issue an amended abstract of judgment reflecting the correct credits, if it has not already done so.

NOT TO BE PUBLISHED.


                                                        MILLER, J.*

We concur:


        ROTHSCHILD, Acting P. J.


        CHANEY, J.

---

        * Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.